**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**MICHAEL BARRICK,**

       Plaintiff,

**v.**                                   **CIVIL ACTION NO.: 3:17-CV-91**
                                                  **(GROH)**

**PNGI CHARLES TOWN GAMING,**
**LLC d/b/a Hollywood**
**Casino at Charles Town Races,**
**and WILLIAM FLORENCE,**

       Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING**
**THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Currently pending before the Court is the Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. ECF No. 73. On December 21, 2018, the Plaintiff filed his response in opposition to the Defendants' motion. ECF No. 76. The Defendants filed a reply on January 4, 2019. ECF No. 93. While the Plaintiff requested oral argument in his response, the Court finds that no additional information will assist the Court in making its decision. Accordingly, upon review of the filings, this matter is now ripe for the Court's consideration. As more fully explained herein, the Defendants' motion is granted.

## I. Background

This civil action commenced on August 2, 2017, when Michael Barrick ("Plaintiff") filed a three-count Complaint alleging wrongful termination and retaliation in violation of West Virginia common law, the Dodd-Frank Act and the Bank Secrecy Act ("BSA"). <u>See</u>

ECF No 1.  On October 6, 2017, the Defendants filed a motion to dismiss the Plaintiff's complaint for failure to state a claim upon which relief can be granted.  ECF No. 11.  On January 29, 2018, this Court granted in part the Defendants' motion, dismissing the Plaintiff's West Virginia common law claim.  ECF No. 18.  On March 6, 2018, the Plaintiff filed a stipulation of dismissal as to his Dodd-Frank Act claim.  ECF No. 21.  Several months later, the Plaintiff filed a motion to amend his complaint, which this Court granted.  ECF Nos. 32, 33, 36, 39, 40.  The Plaintiff's amended complaint, filed on August 9, 2018, alleges two counts, retaliation in violation of the BSA and the Sarbanes-Oxley Act ("SOX").  See ECF No. 41.

Viewing the material facts in the light most favorable to the Plaintiff, the facts are as follows.[1]  The Plaintiff avers that he, along with his father and the rest of the group[2], uncovered and reported an illegal sports gambling operation taking place at Defendant PNGI's casino in Charles Town, West Virginia.   Prior to reporting to Bill Florence ("Florence"), the Vice President of Table Games[3], the group hired a private investigator, Tim May, who was assisting with the matter.  During the course of this investigation, Tim May involved Bob Lind who worked as an investigator for the West Virginia Lottery Commission.  Bob Lind assisted Tim May in the investigation and attended meetings Tim May had with the group.  The group also discussed contacting the Federal Bureau of

---

[1] The facts in this section, unless cited to another source, are taken from the Plaintiff's response in opposition [ECF No. 76] to the Defendants' motion.

[2] The group consists of the Plaintiff, Herman Barrick, Susie Morrison ("Morrison") and Zach Rutherford.

[3] The Plaintiff was employed as an Assistant Pit Manager prior to being terminated from his employment with Defendant PNGI.  The "hierarchy of the Table Games department" according to the Plaintiff, is Dealer, Dual Rate Dealer, Supervisor, Assistant Pit Manager, Pit Manager, Assistant Shift Manager, and Shift Manager.  ECF No. 76 at 1.  "All of these individuals ultimately report to the Vice President of Table Games, which is William 'Bill' Florence."  Id.

Investigation ("FBI") and the Plaintiff believes that Herman Barrick and Bob Lind made the decision to contact the FBI. The Plaintiff alleges that Tim May Investigations told Herman Barrick that the FBI was contacted.

On January 22, 2017, the Plaintiff met with Florence and Repetto, the Plaintiff's shift manager, about his final written warning. Either during this meeting or the next day, the Plaintiff reported his allegations of the illegal sports gambling operation which was being run by Immordino, the Plaintiff's assistant shift manager.[4] The Plaintiff also reported that Champa, another employee, was involved in a sports betting operation and using the money from the sports books to buy a karaoke bar in Laos. The Plaintiff notified Florence that Herman Barrick had contacted the West Virginia Lottery Commission and he was "pretty sure" the FBI was also contacted. Pl.'s Ex. 2, Plaintiff Dep. at 337:9-22. After reporting to Florence, the Plaintiff requested a month off so that the company could perform an investigation into the illegal sports gambling that was taking place at the Hollywood Casino property.

Florence confronted Immordino about the allegations. Sometime after this discussion, Immordino or Repetto told Florence that the Plaintiff had borrowed large sums of money from other employees. Florence reported the Plaintiff's allegations of illegal sports gambling and the allegations that the Plaintiff had borrowed money from other employees to Hollywood Casino. He also reported the sports gambling allegations to the Deputy Director of Security at the West Virginia Lottery, Hollywood Casino's Vice President of Human Resources, Hollywood Casino's General Manager, and the lead

---

[4] Plaintiff affirmed that one of the reasons he made the complaints was because he was afraid he would be terminated from employment. Defs.' Ex. A, Plaintiff Dep. at 276:5-24, 277:1-1.

West Virginia Lottery Investigator at the Hollywood Casino Property. As a result of the investigation, it was discovered that Immordino was running sports pools at Hollywood Casino. Following this discovery, Immordino was terminated from his employment with the casino. Pl.'s Ex. 8, Bak-Boychuk Dep. at 16:15-19; Defs.' Ex. E at 11, n.6; Defs.' Ex. M, Bak-Boychuk Dep. at 60:3-22. Champa was not terminated because there was not a conclusive finding that he was involved in running an illegal sports gambling operation.

Alex Bak-Boychuk, Vice President of Employment and Business Affairs, and Kathy Greene, Vice President of Talent Management at PNGI, conducted an investigation into the allegations against the Plaintiff. This investigation revealed that the Plaintiff had borrowed money from other employees over whom he had a supervisory role. After this investigation, the Plaintiff was presented with a termination notice due to his prior disciplinary record, the amount of money he had borrowed from other employees and his failure to disclose these loans to management. When presented with the notice, the Plaintiff alleged that he had previously disclosed these loans to Morrison, who was his supervisor at the time. The Plaintiff's allegation that he reported to a supervisor was investigated prior to the Plaintiff's termination.[5] Morrison confirmed she knew about the money the Plaintiff had borrowed from one of the employees, Travis Voit. Ultimately, the Plaintiff's employment was terminated and his father and mother were offered separation packages[6].

---

[5] While it is clear that Morrison was aware of the loan the Plaintiff had taken from Travis Voit, it is disputed if Morrison was the Plaintiff's supervisor at the time of the loan or if the Plaintiff reported the loan to her as his supervisor. Even taking the facts in the light most favorable to the Plaintiff and finding she was his supervisor, the Plaintiff still does not provide evidence that he reported the other loan he had taken from Yi Huang.

[6] The Plaintiff alleges that his parents were retaliated against by the casino because the casino was trying to force them to take separation packages. The Plaintiff stated in his response,

## II. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id.</u> at 250.

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586. That is, once the movant has met its burden to show an absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence establishing there is indeed a genuine issue for trial. Fed. R. Civ. P. 56; <u>Celotex Corp.</u>, 477 U.S. at 323-25; <u>Anderson</u>, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249 (citations omitted). A motion for summary judgment should

---

Herman and Linda thought that they were terminated because Greene and Clark started the meeting by informing Herman and Linda that the Plaintiff had been fired and the language in the separation agreement indicated that they were being terminated. . . . Herman and Linda turned down the separation agreement and currently work at the property.
ECF No. 76 at 6.

be denied "if the evidence is such that conflicting inferences may be drawn therefrom, or if reasonable men might reach different conclusions." Phoenix Savs. & Loan, Inc. v. Aetna Cas. & Sur. Co., 381 F.2d 245, 249 (4th Cir. 1967); see also id. at 253 (noting that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

### III. Discussion

### A.  The Bank Secrecy Act ("BSA"), 31 U.S.C. § 5328

### 1.  Applicable Legal Standards

In his amended complaint, the Plaintiff claims whistleblower protection under a provision of the BSA against Defendant PNGI.  This provision provides:

> No financial institution . . . may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to the Secretary of the Treasury, the Attorney General, or any Federal supervisory agency regarding a possible violation of any provision of this subchapter or section 1956, 1957, or 1960 of title 18, or any regulation under any such provision, by the financial institution . . . or any director, officer, or employee of the financial institution.

31 U.S.C. § 5328(a).

In order to prevail on this claim, the Plaintiff must have been (1) an employee of a financial institution who (2) provided information regarding a possible violation of specified laws and regulations by the financial institution, its directors, officers, or employees, to (3) the Treasury Secretary, Attorney General, or "any Federal supervisory agency," (4) and was subjected to employment-related discrimination because he made such a report. Taft v. Agric. Bank of China Ltd., 156 F. Supp. 3d 407, 413 (S.D.N.Y. 2016).

## 2. Analysis

### a. Employee of a financial institution

The parties do not dispute that Defendant PNGI is a "financial institution" subject to the BSA.  31 U.S.C. § 5312(a)(2)(X); ECF No. 76 at 11; Pl.'s Ex. 13, Defs.' Answers to Pl.'s Req. for Admis. No. 12.

### b. Provided information regarding a possible violation

There are two issues regarding whether the Plaintiff provided information of a possible violation of specified laws.  First, the Court must determine if the Plaintiff, or someone at the Plaintiff's request, actually provided this information to the FBI.  Based on the evidence provided by the parties, the Plaintiff believes the FBI was contacted by Bob Lind or Tim May on behalf of the Plaintiff and the rest of the group.  ECF No. 76 at 12; Pl.'s Ex. 2, Plaintiff Dep. at 177:10-178:17; Pl.'s Ex. 4, Herman Barrick Dep. at 121:5-12.  The Plaintiff believes Herman Barrick requested the FBI be contacted.  ECF No. 76 at 12; Pl.'s Ex. 2, Plaintiff Dep. at 342:8-21; Defs.' Ex. A, Plaintiff Dep. at 181:2-9, 341:9-13.  Herman Barrick is uncertain whether or not the FBI was ever actually contacted.  ECF No. 74 at 13; Defs.' Ex. K, Herman Barrick Dep. at 121:13-21, 122:1-3.  Herman Barrick says he did not specifically request the FBI be contacted, but rather, he wanted the investigators to do everything needed to comply with the requirements.  Id.  Based on the evidence submitted by the parties, there is a question of fact regarding whether or not the FBI was contacted at the Plaintiff's request.  It is unclear if Bob Lind or Tim May contacted the state police or the FBI, both agencies or neither agency.  Because there is a genuine dispute of fact as to this material issue, it is a question for the finder of fact, not the Court.

Second, the Court must determine if the possible violation reported is one that is entitled to protection under the whistleblower provision. It is "essential under the BSA that the report . . . suggest a violation of a provision carrying 'the force of law.'" Taft, 156 F. Supp. 3d at 418 (quoting Segarra v. Fed. Reserve Bank of N.Y., 17 F. Supp. 3d 304 (S.D.N.Y. 2014), aff'd, 802 F.3d 409 (2d Cir. 2015)). The BSA "covers employees who merely provide *information* regarding a *possible* violation, and applies to lay employees who may be untutored in the law." Id. (finding a possible violation even though the memo sent to the FRBNY did not identify any statute or regulation that was or may have been violated); see Leshinsky v. Telvent GIT, S.A., 942 F. Supp. 2d 432, 443 n.2 (S.D.N.Y. 2013) ("[I]t would . . . be unfair to expect a plaintiff seeking to inform his boss of financial misbehavior to have a working knowledge of the United States Code.").

In the Plaintiff's amended complaint, he alleges that he disclosed violations of various statutes and implementing regulations because Florence was required to file a suspicious activity report with the Treasury, which he failed to do. ECF No. 41 at 3. The Plaintiff alleges rather than reporting the activity, Florence attempted to cover up the illegal sports gambling by warning those involved and retaliated against him by seeking to have his employment terminated. Id. This is the violation upon which the Defendants rely in their motion when they argue that the Plaintiff did not report a possible violation of law. The Plaintiff asserts in his response that the possible violation of law he was reporting was a violation of 18 U.S.C. § 1956(a). This allegation was included in the Plaintiff's amended complaint under Count II, his SOX claim. If this is the Plaintiff's possible violation, it is unclear what relevance the failure to file a suspicious activity report

has on the Plaintiff's claim. While the Plaintiff should have included this under his BSA claim, it is included in the Plaintiff's amended complaint and the Court will determine if it meets the requirement for a possible violation of law. The Court will not address the Defendants' argument that there was no obligation to file a suspicious activity report because it is not the basis of the Plaintiff's claim.

In the Plaintiff's response, he claims he was reporting a violation of § 1956(a), transferring funds from a place in the United States to a place outside of the United States knowing that the funds are proceeds of unlawful activity. ECF No. 76 at 18-19. The Plaintiff asserts that he provided information of a possible violation because he reported that Champa was using the funds from the illegal sports books to buy a bar in Laos. Id.; Pl.'s Ex. 2, Plaintiff Dep. at 342:8-21; Pl.'s Ex. 14, Tim May Investigation Notes, at PNGI-MB 0000993, 00000996, 00000997, 00000999. Section 1956(a) is one of the enumerated laws covered under the BSA. Therefore, the Plaintiff reported a possible violation of § 1956(a) by an employee of the financial institution, specifically Champa.

      c. Provided information to the Attorney General or "any Federal supervisory agency"

The Defendants argue that the Plaintiff fails to meet the requirement of providing information to the Secretary of the Treasury, the Attorney General or "any Federal supervisory agency." In the Plaintiff's amended complaint, he contends that the FBI is a "Federal supervisory agency" for the purposes of 31 U.S.C. § 5328. ECF No. 41 at 16. The Defendants argue that the FBI is not considered a "Federal supervisory agency" under the United States Code. To support this argument, the Defendants cite 12 U.S.C. § 1813(q) defining a "Federal supervisory agency" as: (1) the Office of the Comptroller of

the Currency; (2) the Federal Deposit Insurance Corporation; or (3) the Board of Governors of the Federal Reserve System. This Court does not find that the FBI could reasonably be interpreted to be a Federal supervisory agency for purposes of the anti-retaliation provision of the BSA. Furthermore, while the Plaintiff relies on this in his amended complaint, this is not the argument he sets forth in his response to the Defendants' motion.[7]

In the Plaintiff's response, he contends that he complained about the illegal acts to the FBI, which was in effect complaining to the Attorney General for the purposes of the BSA. The Plaintiff relies on <u>Taft v. Agricultural Bank of China Ltd.</u>, which found that the Federal Reserve Bank of New York is an entity under the authority of the Board of Governors of the Federal Reserve System. No. 15 CIV. 5321 (PAE), 2016 WL 2766661, at *12-13 (S.D.N.Y. May 12, 2016). The Plaintiff argues the FBI is similar because it is one of the entities under the authority of the Attorney General. The Defendants argue that "[t]he 'General Definition' section of the Financial Crimes Enforcement Network chapter of regulations, enacted under the authority of the BSA at 31 C.F.R. 1010.100(c), defines 'Attorney General' as '[t]he Attorney General of the United States' and does not conflate his office with others." ECF No. 93 at 13-14.

The FBI is "a federal agency falling under the authority of the Attorney General." <u>Schroeder v. Greater New Orleans Fed. Credit Union</u>, 664 F.3d 1016, 1023 n.6 (5th Cir.

---

[7] In the Defendants' reply brief, the Defendants argue that the "Plaintiff cannot now re-amend his First Amended Complaint through briefing in response to a motion for summary judgment . . . and change the entire substance of his pleading regarding to whom he allegedly complained." ECF No. 93 at 13. While the Plaintiff has changed his reasoning for why the FBI is a proper agency to report to, the entire substance of his pleading has not changed. The facts surrounding the Plaintiff's claim and the actual agency that the Plaintiff reported to remain the same.

2011).  Furthermore, while no court has addressed this issue as it applies to this statute,

the Attorney General includes agencies under the Attorney General's authority.  See e.g.,

31 U.S.C. § 3719 Historical and Statutory Notes, Revision Notes and Legislative Reports

("the words 'Attorney General' are substituted for 'Department of Justice' for consistency

in the revised title [this title] and with other titles of the Code").

> A statutory reference to "the Attorney General" is not usually meant to designate the Presidentially-appointed Attorney General personally, but rather the Department of Justice or an agency under the Attorney General's authority.  E.g., L.D.G. v. Holder, No. 13-1011, 744 F.3d 1022, 2014 U.S. App. LEXIS 4662, 2014 WL 944985 at *2 (7th Cir. Mar. 12, 2014) ("Statutory references to the 'Attorney General' include the EOIR [Executive Office for Immigration Review] . . ., which is a component of the Department of Justice."); Morales-Izquierdo v. Gonzales, 486 F.3d 484, 502 (9th Cir. 2007) (dissent) ("[T]he Attorney General is merely a titular decision-maker, an example of statutory synechdoche, using the head of the Department of Justice to refer to all of its employees.  Countless provisions of the INA [Immigration and Nationality Act] refer to determinations of 'the Attorney General' even when those determinations will actually be made by lower-level employees and even when those determinations must actually be made by immigration judges pursuant to § 240 procedures."); United States v. Wencke, 604 F.2d 607, 612 (9th Cir. 1979) ("The term 'Attorney General' as employed in the [statutory] language should not be taken to exclude United States Attorneys or other Department of Justice personnel . . . ."); Jama v. U.S. Citizenship & Immigration Servs., 962 F. Supp. 2d 939, 959 (N.D. Ohio 2013) ("[S]tatutory references to Attorney General are to be read to include . . . [agencies] housed within the Department of Justice.").

Balko v. Ukrainian Nat'l Fed. Credit Union, 2014 U.S. Dist. LEXIS 42427 *71 (Mar. 28,

2014).  By reporting to the FBI, the Plaintiff met the requirement of reporting to the

Attorney General.

> d. Was subjected to employment-related discrimination because he made
>    such a report

The guidance on the proper causation standard to apply in the BSA context is very

limited.  In Taft, the court assumed that the familiar burden-shifting framework of

11

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) would apply to claims under 31 U.S.C. § 5328(a). 156 F. Supp. 3d at 19 ("Without a more convincing showing that Congress intended to impose a more rigorous showing of causation for retaliation claims under the BSA, the Court assumes *arguendo* that—as with, *inter alia*, employment discrimination claims under Title VII—protected conduct need not be the sole cause of the adverse employment action to qualify as actionable retaliation, and such causation may be shown indirectly, by means of circumstantial evidence."). Under this framework, if the plaintiff is able to establish a prima facie case of discrimination by a preponderance of the evidence, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. McDonnell, 411 U.S. at 802.

When assessing causation under other whistleblower provisions, courts have applied a version of the traditional Title VII retaliation test. See Hill v. Mr. Money Finance Co., 491 F. Supp. 2d 725, 730 (N.D. Ohio 2007). Under this test, the plaintiff has the burden to show that his reporting was a contributing factor to his termination.

> "A contributing factor is 'any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.'" "This element is broad and forgiving," and "[t]his test is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a 'significant', 'motivating', 'substantial', or 'predominant' factor in a personnel action in order to overturn that action" . . . . "Temporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation," and "[t]he casual connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event," . . . .

Feldman v. Law Enforcement Associates Corp., 752 F.3d 339, 348 (4th Cir. 2014) (internal citations omitted). Once the plaintiff has met this burden, "then the defendant employer must demonstrate by clear and convincing evidence that it would have taken

the same challenged personnel action in the absence of subject disclosure." <u>Hill</u>, F. Supp. 2d at 730-31.  The Court does not find any basis to depart from the test used under other whistleblower provisions.

The Defendants contend that the Plaintiff was terminated because he was on final written warning due to prior violations and further violations were discovered over the course of the investigation.  The Defendants also contend the Plaintiff admitted he repeatedly violated Hollywood Casino's policies and took substantial loans from his subordinates that were never disclosed to Hollywood Casino.  ECF No. 73 at 4; Defs.' Ex. A, Plaintiff Dep. at 300:7-23, 303:2-21.  Further, they aver that Herman Barrick, the Plaintiff's father, is a direct comparator because he made identical reports of sports betting and remains employed by Hollywood Casino.  ECF No. 73 at 4; Defs.' Ex. K, Herman Barrick Dep. at 137:13-24, 138:1-15, 139:19-24, 140:1-11.

The Defendants cite to <u>Feldman</u> as support for this argument.  In <u>Feldman</u>, the Fourth Circuit found that the employee "failed to satisfy his rather light burden of showing by a preponderance of evidence that the activities tended to affect his termination in at least some way."  752 F.3d at 348.  In making this finding, the Fourth Circuit found "most significant[]," that "the Outside Directors considered [the employee] to have thrown them under the bus during his meetings with the Wortleys" and his termination came less than one month after this meeting.  <u>Id.</u> at 349.  The court found this "undoubtedly constitute[d] a legitimate intervening event" . . . and "coupled with the passage of a significant amount of time after the employee's alleged protected activities, sever[ed] the casual connection."

Id.  The court also noted that another employee that reported the alleged violation was asked to remain at the company.  Id.

The facts of this case, even with a temporal proximity of only one month between the close of the investigation and the Plaintiff's termination, are substantially similar to Feldman.  From December 31, 2016 to January 18, 2017, the Plaintiff received warnings for failing to adhere to Hollywood Casino's call out procedures, absenteeism and tardiness, failing to call surveillance in response to a guest's request while also failing to explain his decision to the guest while standing too far away and failing to send an employee home when the Casino was overstaffed.  Defs.' Ex. A, Plaintiff Dep. at 89:8-11, 94:8-24, 95:1-21, 96:14-24, 97:1-19, 100:12-22, 103:18-24, 105:1-15, 107:12-17, 109:2-14, 118:2-6, 22-24, 119:1-10; Defs.' Ex. C; Defs.' Ex. J.  Due to this conduct, the Plaintiff was on a final written warning with the casino and any further violation would lead to discharge from employment.  Id. at 118:22-24, 119:1-10.  After receiving his final written warning, the Plaintiff reported violations of sports betting by his co-workers, which he admitted he personally participated in.  Id. at 208:20-24, 209:1-3.  Afterward, the Plaintiff's supervisor contacted the West Virginia Lottery Commission and the casino retained an independent third party to investigate the Plaintiff's report.  At some point after the Plaintiff reported to Florence, Florence discovered that the Plaintiff owed money from loans he obtained from other employees.  This led the casino to investigate the loans the Plaintiff had obtained from other employees, because it violated company policy.  The Defendants have set forth clear and convincing evidence that the Plaintiff's violations, and not the Plaintiff's reporting, led to his termination from employment with Hollywood Casino.

Furthermore, as in <u>Feldman</u>, Herman Barrick, who also reported the violations, remains employed at Hollywood Casino.

The Plaintiff lists several disputed facts which he argues are material. The Plaintiff argues that when the Defendants learned about the Plaintiff's loans is a material fact in dispute. The Defendants allege that the loans were discovered when the Plaintiff took a leave of absence and employees started to become concerned that the Plaintiff would not be returning and would not be paying them back. ECF No. 74 at 7. The Plaintiff alleges that Florence learned of the loans from Immordino or Repetto after the Plaintiff accused Immordino of running a sports pool. ECF No. 76 at 7; Pl.'s Ex. 3, Florence Dep. at 57:20-58-20. The Plaintiff asserts this fact is material because Immordino revealed the Plaintiff's loans in retaliation for the Plaintiff disclosing that Immordino ran a sports betting pool. ECF No. 76 at 7-8. It is undisputed that Immordino no longer works at the casino as a result of the investigation and he was not involved in the decision to terminate the Plaintiff. Viewing the facts in the light most favorable to the Plaintiff, Immordino's motivation for reporting the loans was not imputed to the employer. The Plaintiff's reported violation protected under this statute was involving Champa's conduct, not Immordino's conduct. While the Plaintiff did report that Immordino was involved in illegal sports gambling, he did not argue in his response the report was a basis for the possible violation of law. The Plaintiff makes a similar argument regarding Florence providing evidence for the investigation even though it was not requested of him. ECF No. 76 at 22; Pl.'s Ex. 3, Florence Dep. at 73:14-75:1; Ex. 8, Bak-Boychuk Dep. at 72:5-9. The Court applies the same analysis and conclusion to this argument.

The Plaintiff argues there is a material fact at issue because the parties dispute whether the Defendants took retaliatory action against Herman Barrick. ECF No. 76 at 8. The Plaintiff asserts that Herman Barrick was retaliated against because the company tried to force him to take a separation package the day the Plaintiff was terminated. Id.; Pl.'s Ex. 4, Herman Barrick Dep. at 197:13-198:9, 200:23-201:4; Ex. 11, Linda Barrick Dep. at 48:17-51:13. The Court has reviewed the depositions and finds there was a misunderstanding as to whether Herman Barrick was being discharged or provided with a voluntary separation agreement. Even in the light most favorable to the Plaintiff, viewing "the separation package as a tactic for the Defendants to remove all people who were involved in the disclosure of sports betting," [ECF No. 76 at 9] Herman Barrick remains employed at the casino. He was not terminated for his reporting of the possible violation. The Plaintiff, who was on a final written warning, was terminated from the casino when his loans were discovered. Furthermore, even without Herman Barrick as a direct comparator, the Court finds a legitimate intervening event exists. The Plaintiff was on final written warning when he violated company policy further.

The Plaintiff argues that Al Welsh, his second line supervisor, knew about a loan he obtained from another employee, Milton Brooks, and the policy was never enforced. Pl.'s Ex. 8, Bak-Boychuk Dep. at 32:6-19; Pl.'s Ex. 10, CTRS Investigation at PNGI-MB 0000579. Al Welsh never reported the Plaintiff's loan obtained from Milton Brooks to Florence, Vice President of Table Games. When his failure to report was revealed during the investigation into the Plaintiff's loans, there was recommended discipline for Al Welsh

for not handling this issue properly. Pl.'s Ex. 10, CTRS Investigation at PNGI-MB 0000579.

The Plaintiff further argues that the investigation into the Plaintiff's loans was a "fishing expedition" to find a reason to terminate the Plaintiff. To support this assertion, he states that there were allegations of other employees borrowing and loaning money to each other, but only his loans were verified. ECF No. 76 at 9; Pl.'s Ex. 8, Bak-Boychuk Dep. at 50:2-6, 100:21-101:18; Pl.'s Ex. 10, CTRS Investigation, at PNGI-MB 0000579. The facts in the record show that there was a recommendation for other employees as a result of this investigation, including Al Welsh. The Plaintiff argues that he was the only employee terminated for this conduct [ECF No. 76 at 9], but he does not provide any evidence showing any of the other employees investigated were on final written warning. He also argues that economic relationships were not being tracked by Schedulers and Shift Managers and that training had not been provided on economic relationships. ECF No. 76 at 9-11; Pl.'s Ex. 6, Morrison Dep. at 25:13-26:12; Pl.'s Ex. 8, Bak-Boychuk Dep. at 34:17-35:12; Pl.'s Ex. 9, Greene Dep. at 48:12-49:8; Pl.'s Ex. 10, CTRS Investigation Summary. The Plaintiff argues that without training on this policy and a proper reporting procedure, "that Defendants' enforcement of the policy, when it had not previously made efforts to enforce the policy before, was merely a way to excise the Plaintiff from Hollywood Casino." ECF No. 76 at 11. Ultimately, the Plaintiff acknowledged that he read and signed off on the policy prohibiting economic relationships and he acknowledged that he understood his conduct was a violation of policy. ECF No. 74 at 7; Defs.' Ex. F; Defs.' Ex. A, Plaintiff Dep. at 305:6-24, 306:1-8.

The Court finds, even under this broad and forgiving standard, that a legitimate intervening event is present and the Plaintiff was terminated from his employment for non-discriminatory reasons.  Even if the Plaintiff had provided enough evidence that his report was a contributing factor, the Defendants provided clear and convincing evidence that the Plaintiff would have been terminated for his violation of policy without his protected reporting.  Therefore, this claim fails as a matter of law.

### B.  The Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A

#### 1.  Applicable Legal Standards

The Plaintiff claims whistleblower protection under the Sarbanes-Oxley Act.  The Sarbanes-Oxley Act provides:

> No [publicly-traded company], or any officer [or] employee . . . of such company, may discharge . . . an employee . . . because of any lawful act done by the employee . . . to provide information . . . or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1342 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conduct by . . . a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct) . . . .

18 U.S.C. § 1514(a).  The same burden-shifting framework applied to the BSA claim is applied to SOX whistleblower claims.  See Welch v. Chao, 536 F.3d 269, 275 (4th Cir. 2008).  "Accordingly, an employee bears the initial burden of making a prima facie showing of retaliatory discrimination; the burden then shifts to the employer to rebut the employee's prima facie case by demonstrating by clear and convincing evidence that the

employer would have taken the same personnel action in the absence of the protected activity." Id.

In order to make a prima facie showing, by a preponderance of the evidence, the Plaintiff must prove: (1) he engaged in protected activity; (2) the employer knew, actually or constructively, that he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the circumstances raise and inference that the protected activity was a contributing factor in the personnel action. Feldman, 752 F.3d at 344.

## 2. Analysis

To engage in protected activity, an employee must report conduct "that he or she *reasonably believes* constituted a violation of federal law." Sylvester v. Parexel Int'l LLC, ARB No. 07-123, ALJ Nos. 2007-SOX-039, 2007-SOX-042, 2011 WL 216854 *15 (ARB May 25, 2011) (emphasis in original). "[A]n employee's whistleblower communication is protected [even] where based on a reasonable, but mistaken belief that the employer's conduct constitutes a violation of one of the six enumerated categories of law under Section 806." Id. at 13. To have a reasonable belief, the Plaintiff must show that he held a subjective belief and that the belief was objectively reasonable. Welch, 536 F.3d at 275. "Thus, [the Plaintiff] must show both that he actually believed the conduct complained of constituted a violation of pertinent law and that 'a reasonable person in his position would have believed that the conduct constituted a violation.'" Id. at n.4 (quoting Livingston v. Wyeth, Inc., 520 F.3d 344, 352 (4th Cir. 2008)).

The Plaintiff argues that he held a subjective belief that the conduct he was reporting constituted a violation of a law covered under section 806 of SOX. He supports

this by alleging that sports gambling was "unlawful" and he "was concerned it was affecting the business."  ECF No. 76 at 24; Pl.'s Ex. 2, Plaintiff Dep. at 148:4-12.  The Defendants argue the Plaintiff admitted that he had no reasonable belief that the conduct he alleged constituted a violation of the specific laws enumerated under SOX.  ECF No. 74 at 19-20; Defs.' Ex. A, Plaintiff Dep. at 185:1-6, 186:9-19, 187:6-16.  The Defendants base this argument on the Plaintiff's testimony that he did not know what mail fraud, wire fraud, bank fraud, securities fraud or the other enumerated laws were under SOX.  Id.

The Court would find it hard, if not impossible, for someone to hold a subjective belief of a violation if they have no understanding of the law.  This is not to say the Plaintiff needed to know the elements of fraud or an exact definition, but to have a belief, he should have, at the very least, a basic understanding.  "It would make no sense to allow [the Plaintiff] to proceed if he himself did not hold the belief required by the statute. . . ." Livingston, 520 F.3d at 352.  Because this Court finds the Plaintiff did not hold a subjective belief that the conduct he reported violated one of the enumerated laws, it is not necessary to address if the Plaintiff's belief was objectively reasonable or if the "definitively and specifically" standard is still the appropriate test to apply.[8]  The Plaintiff did not reasonably believe the reported conduct constituted a violation of one of the laws covered by SOX.

---

[8] The parties disagree about which standard the Court should apply.  The Defendants argue that the Plaintiff's protected activity must "definitively and specifically relate to" one of the six enumerated categories of law under SOX because the Fourth Circuit has not adopted the less stringent standard in Sylvester v. Parexel Int'l LLC, ARB No. 07-123, ALJ Nos. 2007-SOX-039, 2007-SOX-042, 2011 WL 216854 *15 (ARB May 25, 2011).  Plaintiff argues the Fourth Circuit provided deference to the Administrative Review Board's ("ARB") decision when adopting the "definitively and specifically" test and would apply deference to the most recent decision in Sylvester.  The Court does not find it necessary to address this argument because Plaintiff's claim fails even under the less stringent standard adopted in Sylvester.

Even if the Plaintiff was able to succeed in showing that he had a reasonable belief, by a preponderance of the evidence, his claim would still fail as a matter of law. The Plaintiff has the burden of establishing that his protected activity was a contributing factor to his termination. Even if he were able to meet this burden, the Defendants would still prevail. As discussed more thoroughly under the Plaintiff's BSA claim, a legitimate intervening event exists and the Defendants have established by clear and convincing evidence that the same unfavorable personnel action would have been taken in the absence of the Plaintiff's report.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** the Defendants' Motion for Summary Judgment. ECF No. 73. Accordingly, the Court **DISMISSES** this action **WITH PREJUDICE**. The Court **ORDERS** that this case be **STRICKEN** from the Court's active docket. The Court further **ORDERS** that all pending motions be **TERMINATED AS MOOT**.

The Clerk is **DIRECTED** to transmit copies of this Order to all counsel of record herein.

**DATED:** February 8, 2019

GINA M. GROH
CHIEF UNITED STATES DISTRICT JUDGE